

01

02

03

04

05

06

07
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

08
AT SEATTLE

09 JEROME BLAKE,                                )
                                               )   CASE NO. C14-0633-JLR-MAT
10          Petitioner,                        )
                                               )
11          v.                                 )   REPORT AND RECOMMENDATION
                                               )
12 DONALD HOLBROOK,                            )
                                               )
13          Respondent.                        )
   _____ )

14

15                              <u>INTRODUCTION</u>

16          Petitioner Jerome Blake proceeds *pro se* in this habeas corpus matter pursuant to 28

17 U.S.C. § 2254.   He is in custody pursuant to a 2011 conviction by jury verdict for First Degree

18 Murder with a Firearm.   (Dkt. 12, Ex. 1.)   Snohomish County Superior Court sentenced

19 petitioner to 380 months confinement and a term of community custody.   (*Id.*)

20          Petitioner raises three grounds for relief in his habeas petition.   (Dkt. 3.)   Respondent

21 submitted an answer to the petition, along with relevant portions of the state court record, and

22 argues for dismissal.   (Dkts. 9 & 12.)

REPORT AND RECOMMENDATION
PAGE -1

01      The Court has now considered the record relevant to the grounds raised in the petition.

02 For the reasons discussed herein, it is recommended that petitioner's habeas petition be

03 DENIED and this case DISMISSED.

04                                        <u>BACKGROUND</u>

05      The Washington Court of Appeals described petitioner's case as follows:

06      On the evening of June 22, 2010, Blake, along with Arthur Cooper and
        Brandon Lewis, decided to purchase OxyContin pills.  Quinlin Bess, a friend of
07      Cooper, initiated a drug deal to acquire the OxyContin on behalf of the
        purchasers with the help of Ivor Williams.  Williams connected Bess with a
08      seller, Marquise Brown.

09      Brown, however, schemed to surreptitiously sell OxyContin pills that
        could not be smoked and, thus, were less desirable as street drugs.  Recognizing
10      that problems might ensue, Brown telephoned his brother, James Baskin, and
        instructed him not to answer any telephone calls for the rest of the evening from
11      Brown himself or from any telephone numbers that Baskin did not recognize.
        Brown then assigned to Baskin's telephone number in his cell phone the
12      fictitious name "Mike."

13      Bess, carrying $2,400 of the purchasers' money, thereafter met with
        Williams and Brown.   The three drove to the house of Brown's friend where the
14      pills were stored.  Bess gave Brown the $2,400 and then departed with the pills.
        Later in the evening, Bess realized that the pills could not be smoked.  Bess
15      reported to Cooper and Blake that the pills were "fake" and that he would try to
        get their money back.  Bess, joined by his girlfriend, Tricia Hawthorne, then
16      met with Brown and Williams.

17      Bess confronted Brown about the "fake" pills.  In turn, Brown
        telephoned "Mike" in a feigned attempt to retrieve the $2,400.  Brown claimed
18      that it was "Mike" who had delivered the pills.  Supposedly looking for
        "Mike," the group drove to a nearby park and searched the surrounding
19      neighborhood.  Blake and Cooper then joined the group, which continued to
        search for "Mike" in an attempt to retrieve the purchase money.  Ultimately,
20      Williams noted that tension was rising among the group.  While the group was
        standing outside of their vehicles, Williams saw Blake put his hands under his
21      shirt, and he heard a metallic "click-click" sound.

22      Blake began speaking with Brown.  Brown, who was terrified, was on

REPORT AND RECOMMENDATION
PAGE -2

01   his knees with his pockets turned out.   Brown was pleading with Blake, telling
     Blake that he did not have his money, but that he would get it for him.   Bess
02   turned away to telephone "Mike."   At this time, Blake was standing roughly 3
     feet from Brown, and Cooper and Williams were standing roughly 10 feet from
03   Brown.   Blake was standing to the right of Williams.   An instant later, Brown
     was shot, and he toppled to the ground.   Williams described seeing a muzzle
04   flash on his right side.   Brown died from the gunshot wound; physical evidence
     later indicated that the gun was less than one foot from Brown's head when it
05   was fired and that the path of the bullet went from the front, right side of his head
     to the rear, left side.

06
             In the immediate aftermath of the shooting, Bess ran to Hawthorne's car,
07   and they drove to Jamie Mayer's house.   Bess noticed a wound on his neck that
     he thought resulted from the bullet skimming his neck.   [Footnote 1:   After
08   later speaking with the police and being informed of the physical evidence at the
     scene of the shooting, Bess came to believe that the more likely cause of the
09   wound on his neck was the shell casing as it ejected from the gun, rather than the
     bullet itself.]   Bess and Hawthorne arrived at Mayer's house within 12 minutes
10   of the shooting.   Blake arrived shortly thereafter.   When Bess saw Blake, Bess,
     referring to the wound on his neck, accused Blake of shooting him.   Blake
11   replied, "my bad, my bad."

12           Detective Kevin Allen investigated the shooting.   Allen determined that
     at the time that Bess turned away from Brown just before the shooting, he had
13   telephoned Baskin and left a voicemail that recorded some of the commotion
     that occurred around the time of the shooting.   The recording included the
14   following utterances:

15           [Bess]:   "Hey bro.   This ain't, this ain't your little homeboy, my
             nigger, we seen you drive off, bro, you took somethin' that don't
16           belong to you, my nigger, you're . . . "   [Muffled noises]   "Go,
             go, go."
17           [Hawthorne]:   "Who did he shoot?   Why was he shooting?
             Who did he shoot?"
18           [Bess]:   "I don't know.   Coop [Footnote 2:   Cooper was
             known as "Coop."] didn't shoot nobody."
19           [Hawthorne]:   "Who shot?"
             [Bess]:   "Just go."
20           [Hawthorne]:   "You did?   Jay [Footnote 3:   Blake was known
             as "Jay."]   did?   Did Jay?
21           [Bess]:   "Yes."

22   Br. of Appellant at 11.


REPORT AND RECOMMENDATION
PAGE -3

01      Bess and Hawthorne, fearing retaliation from Baskin, sought protection
from the police.   They were referred to Detective Allen.   Bess told Allen that
02   Blake was the person who had shot Brown.   Bess indicated to Detective Allen
that Williams was also present at the scene of the shooting.   The police later
03   interviewed Williams, who was shown a photomontage from which he also
identified Blake as the shooter.   Both Bess and Williams claimed to have not
04   been looking directly toward Brown at the time of the shooting, but surmised
that Blake was the shooter based on the surrounding circumstances.

05
        The State thereafter charged Blake with one count of murder in the first
06   degree with a firearm enhancement.   Prior to trial, Blake moved to exclude the
voice mail recording, wherein Bess identified Blake as the shooter by
07   responding "yes" to Hawthorne's question, claiming that it was inadmissible
hearsay.   The trial court denied the motion, ruling that the content of the
08   statement in the recorded message qualified as both an excited utterance and a
present sense impression, and that the statement was therefore admissible.

09
        The defense also sought introduction of impeachment evidence
10   demonstrating Bess's bias (as a witness for the State).   The proposed evidence
concerned an occasion in which Hawthorne reported to the police domestic
11   violence perpetrated upon her by Bess.   This, according to Blake, gave Bess a
motive to lie to Hawthorne when he made comments to her about the identity of
12   the shooter.   The trial court excluded the proffered evidence, ruling that it was
not sufficiently relevant to any fact in issue.

13
        The defense also moved pretrial to preclude any witness from offering
14   testimony that constituted an opinion of guilt of the defendant.    Blake
specifically requested that Detective Allen be precluded from testifying that
15   Hawthorne's and Bess's initial statements to the police were consistent with
each other.   The court granted the motion.

16
        The jury found Blake guilty as charged.   Blake was sentenced to a
17   standard range sentence of 380 months of incarceration.

18   (Dkt. 12, Ex. 2 at 1-5.)

19      Petitioner filed an appeal of the judgment and sentence, arguing:  (1) denial of due

20   process when witnesses were permitted to render opinions as to guilt; (2) trial court error in

21   admission of hearsay evidence despite the declarant's lack of personal knowledge; (3) denial of

22   fair trial through prosecutorial misconduct; (4) trial court error in exclusion of impeachment

REPORT AND RECOMMENDATION
PAGE -4

01  evidence; and (5) cumulative errors resulting in denial of fair trial.  (*Id.*, Ex. 3 at 1.)   By order

02  dated December 24, 2012, the Washington Court of Appeals affirmed petitioner's conviction.

03  (*Id.*, Ex. 2.)

04        Petitioner sought review in the Washington Supreme Court.   (*Id.*, Ex. 6.)   He

05  presented two issues for review:   (1) "Is a defendant's right to a fair trial violated where the

06  jury is permitted to hear a lay witness' personal belief regarding the core fact determining guilt

07  when that witness has no personal knowledge of that particular fact?"; and (2) with regard to

08  ER 602: "Must a party offering hearsay statement under the excited-utterance or

09  present-sense-impression exceptions show the declarant possessed personal knowledge of the

10  declared fact before the statement may be admitted?"   (*Id.* at 1-2.)   The Supreme Court denied

11  review without comment on June 4, 2013.  (*Id.*, Ex. 7.)   The Court of Appeals issued its

12  mandate on June 26, 2013.   (*Id.*, Ex. 8.)

13        Petitioner did not file a personal restraint petition or other collateral challenge to his

14  conviction.

15                               <u>DISCUSSION</u>

16        Petitioner raises three grounds for relief:

17        <u>Ground one</u>:   Was the petitioner denied due process where witnesses were
          permitted to render an opinion as to his guilt?
18
          
19        <u>Ground two</u>:   Did trial court err when it admitted hearsay evidence despite the
          [declarant's] lack of knowledge?

20        <u>Ground Three</u>: Was the petitioner denied a fair trial due to prosecutorial
          misconduct?
21

22  (Dkt. 3 at 5-8.)

REPORT AND RECOMMENDATION
PAGE -5

01          Respondent argues petitioner properly exhausted his first ground for relief, but that his

02   second and third grounds for relief are unexhausted and now procedurally barred and defaulted.

03   Respondent further argues that petitioner's first ground for relief lacks merit.   For the reasons

04   set forth below, the Court agrees with respondent and recommends habeas relief be denied and

05   this matter dismissed.

06   A.    <u>Exhaustion and Procedural Default</u>

07          "An application for a writ of habeas corpus on behalf of a person in custody pursuant to

08   the judgment of a State court shall not be granted unless it appears that . . . the applicant has

09   exhausted the remedies available in the courts of the State."   28 U.S.C. § 2254(b)(1)(A).   The

10   exhaustion requirement "is designed to give the state courts a full and fair opportunity to

11   resolve federal constitutional claims before those claims are presented to the federal courts,"

12   and, therefore, requires "state prisoners [to] give the state courts one full opportunity to resolve

13   any constitutional issues by invoking one complete round of the State's established appellate

14   review process."   *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

15          In order to provide the state courts with the requisite "opportunity" to consider his

16   federal claims, a prisoner must "fairly present" his claims to each appropriate state court for

17   review, including a state supreme court with powers of discretionary review.   *Baldwin v.*

18   *Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and

19   *O'Sullivan*, 526 U.S. at 845).   *Accord James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994) (complete

20   round of the state's established review process includes presentation of a petitioner's claims to

21   the state's highest court).   Additionally, a petitioner must "alert the state courts to the fact that

22   he was asserting a claim under the United States Constitution." *Hiivala v. Wood*, 195 F.3d

REPORT AND RECOMMENDATION
PAGE -6

01   1098, 1106 (9th Cir. 1999) (citing *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995)). "The mere

02   similarity between a claim of state and federal error is insufficient to establish exhaustion." *Id*.

03   (citing *Duncan*, 513 U.S. at 366). "Moreover, general appeals to broad constitutional

04   principles, such as due process, equal protection, and the right to a fair trial, are insufficient to

05   establish exhaustion." *Id*. (citing *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996)). A

06   habeas petitioner must "include reference to a specific federal constitutional guarantee, as well

07   as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S.

08   152, 162-63 (1996); *accord Shumway v. Payne*, 223 F.3d 982, 987-88 (9th Cir. 2000); *Hiivala*

09   *v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). "It is not enough that all the facts necessary to

10   support the federal claim were before the state [court], or that a somewhat similar state-law

11   claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted).

12        In this case, respondent concedes and the Court agrees that petitioner properly

13   exhausted his first ground for relief by fairly presenting the claim to the Washington Supreme

14   Court as a federal constitutional violation. (*See* Dkt. 12, Ex. 6 at 2, 10 (asserting denial of fair

15   trial in violation of the Sixth Amendment).) The Court further agrees with respondent that

16   petitioner failed to exhaust his second and third grounds for relief. While raising his second

17   claim before the Washington Supreme Court, petitioner did not present the issue in that claim as

18   a federal constitutional violation. (*See id*. at 17-20.) He, instead, presented the claim as an

19   error under Washington State rules of evidence. (*Id*. (arguing error under Evidence Rule

20   602).) Also, with respect to his third ground for relief, petitioner did not include a claim of

21   prosecutorial misconduct in his petition for review. (*See Id*., Ex. 6.) Accordingly, petitioner

22   failed to properly exhaust both his second and third grounds for relief.

REPORT AND RECOMMENDATION
PAGE -7

01          When a petitioner fails to exhaust his state court remedies and the court to which

02   petitioner would be required to present his claims in order to satisfy the exhaustion requirement

03   would now find the claims to be procedurally barred, there is a procedural default for purposes

04   of federal habeas review.  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).  RCW

05   10.73.090(1) provides that a petition for collateral attack on a judgment and sentence in a

06   criminal case must be filed within one year after the judgment becomes final.  A judgment

07   becomes final for purposes of state collateral review on the last of the following dates: (1) the

08   date the judgment is filed with the clerk of the trial court; (2) the date an appellate court issues

09   its mandate disposing of a timely direct appeal; or (3) the date the United States Supreme Court

10   denies a timely petition for certiorari to review a decision affirming the conviction on direct

11   appeal.  RCW 10.73.090(3); *In re Pers. Restraint of Runyan*, 121 Wn.2d 432, 439 n.4, 853

12   P.2d 424 (1993).

13          In this case, the Washington Court of Appeals issued a mandate in petitioner's case on

14   June 26, 2013 (Dkt. 12, Ex. 8) and there is no indication petitioner filed a petition for a writ of

15   certiorari to the United States Supreme Court.  As such, petitioner's judgment became final as

16   of June 26, 2013, and he had until on or about June 26, 2014 to pursue collateral relief.

17   Because petitioner did not file a personal restraint petition within that one-year time period, his

18   unexhausted claims are now time-barred and procedurally defaulted in this Court.

19          When a state prisoner defaults on his federal claims in state court, pursuant to an

20   independent and adequate state procedural rule, federal habeas review of the claims is barred

21   unless the prisoner can demonstrate cause and prejudice, or demonstrate that failure to consider

22   the claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750;

REPORT AND RECOMMENDATION
PAGE -8

01  *Harris v. Reed*, 489 U.S. 255, 263 (1989).  To establish "cause," petitioner must show that

02  some objective factor external to the defense prevented him from complying with the state's

03  procedural rule.  *Coleman*, 501 U.S. at 753 (citing *Murray v. Carrier*, 477 U.S. 478, 488

04  (1986)).  *See also Boyd v. Thompson*, 147 F.3d 1124, 1126 (9th Cir. 1998) ("Cause 'must be

05  something external to the petitioner, something that cannot fairly be attributed to him.'")

06  (quoting *Coleman*, 501 U.S. at 753).  To show "prejudice," the petitioner "must shoulder the

07  burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but

08  that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error

09  of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in

10  original).  Only in an "extraordinary case" may the habeas court grant the writ without a

11  showing of cause or prejudice to correct a "fundamental miscarriage of justice" where a

12  constitutional violation has resulted in the conviction of a defendant who is actually innocent.

13  *Murray*, 477 U.S. at 495-96.

14       Petitioner fails to set forth any basis for excusing his procedural default.  Nor does

15  petitioner present any basis for a colorable showing of actual innocence.  Petitioner, therefore,

16  fails to demonstrate that his second and third grounds for relief are eligible for review in these

17  federal habeas proceedings.

18  B.    Merits Review of Exhausted Ground for Relief

19       Federal habeas corpus relief is available only to a person "in custody in violation of the

20  Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A habeas corpus

21  petition may be granted with respect to any claim adjudicated on the merits in state court only if

22  the state court's decision was contrary to or involved an unreasonable application of clearly

01   established federal law, as determined by the United States Supreme Court.   § 2254(d)(1).   In

02   addition, a habeas corpus petition may be granted if the state court decision was based on an

03   unreasonable determination of the facts in light of the evidence presented in the state court

04   proceeding.   § 2254(d)(2).

05         Under the "contrary to" clause of § 2254(d)(1), a federal habeas court may grant the writ

06   only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

07   question of law, or if the state court decides a case differently than the Supreme Court has on a

08   set of materially indistinguishable facts.   *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

09   Under the "unreasonable application" clause, a federal habeas court may grant the writ only if

10   the state court identifies the correct governing legal principle from the Supreme Court's

11   decisions but unreasonably applies that principle to the facts of the prisoner's case.   *Id.* at

12   412-13.   The Supreme Court has made clear that a state court's decision may be overturned

13   only if the application is "objectively unreasonable."   *Lockyer v. Andrade*, 538 U.S. 63, 69

14   (2003).

15         In considering a habeas petition, this Court's review "is limited to the record that was

16   before the state court that adjudicated the claim on the merits."   *Cullen v. Pinholster*, __ U.S.

17   __, 131 S. Ct. 1388, 1398-1400, 1415 (2011).   If a habeas petitioner challenges the

18   determination of a factual issue by a state court, such determination shall be presumed correct,

19   and the applicant has the burden of rebutting the presumption of correctness with clear and

20   convincing evidence.   28 U.S.C. § 2254(e)(1).

21         In his first ground for relief, petitioner avers witness testimony at trial included

22   testimony as to his guilt and that such testimony invaded the province of the jury and deprived

REPORT AND RECOMMENDATION
PAGE -10

01   him of a fair trial.   (Dkt. 1-1 at 12, 19.)   However, while casting his claim as a violation of the

02   Sixth and Fourteenth Amendments, the arguments raised by petitioner in large part set forth

03   alleged violations of state rules of evidence.   (*See* Dkt. 1-2 at 12-20.)   Federal habeas relief is

04   not available for errors of state law.   *Estelle v. McGuire*, 502 U.S. 62, 67-72 (1991) ("[I]t is not

05   the province of a federal habeas court to reexamine state-court determinations on state-law

06   questions.   In conducting habeas review, a federal court is limited to deciding whether a

07   conviction violated the Constitution, laws, or treaties of the United States.") *Cf. Walters v.*

08   *McCormick*, 122 F.3d 1172, 1175 (9th Cir. 1997) ("Admission of the testimony of the child

09   victim, K.C., is an evidentiary issue that the Montana trial court addressed under Montana law.

10   We do not review the admission for error; 'we may only consider whether [Walters's]

11   conviction violated constitutional norms.'") (quoting *Jammal v. Van de Kamp*, 926 F.2d 918,

12   919 (9th Cir. 1991)).

13        Nor does petitioner otherwise set forth a basis for habeas relief.   "Claims of

14   inadmissibility of evidence are cognizable in habeas corpus proceedings only when admission

15   of the evidence violated the defendant's due process rights by rendering the proceedings

16   fundamentally unfair."   *Hamilton v. Vasquez*, 17 F.3d 1149, 1159 (9th Cir. 1994).   With

17   regard to witness testimony, the Ninth Circuit Court of Appeals has confirmed the absence of

18   clearly established federal law supporting a constitutional violation as alleged by petitioner in

19   this case, and as described in the excerpt of the state court decision below.   That is, the United

20   States Supreme Court has not found a constitutional violation through the admission of

21   testimony "concerning an ultimate issue to be resolved by the trier of fact."   *Moses v. Payne*,

22   543 F.3d 1090, 1105-06 (9th Cir. 2008) (addressing expert testimony, and stating:   "That the

REPORT AND RECOMMENDATION
PAGE -11

01 Supreme Court has not announced such a holding is not surprising, since it is 'well-established

02 . . . that expert testimony concerning an ultimate issue is not per se improper.'").   *Accord*

03 *Briceno v. Scribner*, 555 F.3d 1069, 1077 (9th Cir. 2009), *overruled on other grounds as stated*

04 *in Emery v. Clark*, 643 F.3d 1210, 1215 (9th Cir. 2011).   While a direct opinion as to guilt or

05 innocence is not permissible, a witness "'may otherwise testify regarding even an ultimate issue

06 to be resolved by the trier of fact.'"   *Moses*, 543 F.2d at 1106 (quoting *United States v. Lockett*,

07 919 F.2d 585, 590 (9th Cir. 1990)).

08      In this case, the state court rejected petitioner's claim upon concluding that "no such

09 impermissible opinions on guilt were offered[.]"   (Dkt. 12, Ex. 2 at 5-6.)   The state court

10 reasoned:

11      Evidence Rule (ER) 701 allows testimony as to "opinions or inferences
which are (a) rationally based on the perception of the witness, and (b) helpful to
12 a clear understanding of the witness' testimony or the determination of a fact in
issue."   Similarly, ER 704 provides that "[t]estimony in the form of an opinion
13 or inferences otherwise admissible is not objectionable because it embraces an
ultimate issue to be decided by the trier of fact."   Case law establishes that the
14 limits of ER 701 and ER 704 are exceeded when a witness testifies "in the form
of an opinion regarding guilt . . . of the defendant," State v. Demery, 144 Wn.2d
15 753, 759, 30 P.3d 1278 (2001), because such an opinion "'invad[es] the
exclusive providence of the [jury].'"   Demery, 144 Wn.2d at 759 (alternations
16 in original) (quoting City of Seattle v. Heatley, 70 Wn. App. 573, 577, 854 P.2d
658 (1993)).   However, "testimony that . . . is based on inferences from the
17 evidence is not improper opinion testimony."   Heatley, 70 Wn. App. at 578.
"The fact that an opinion supports a finding of guilt . . . does not make the
18 opinion improper."   State v. Collins, 152 Wn. App. 429, 436, 216 P.3d 463
(2009).

19

20      A trial court's ruling on the admissibility of opinion evidence is
reviewed for abuse of discretion.   Demery, 144 Wn.2d at 758.   Here, Detective
21 Allen testified that both Bess and Williams identified Blake as the shooter.
During direct examination by the prosecutor, Detective Allen was asked,
"[T]hroughout the course of that interview, was Mr. Bess consistent on who the
22 shooter was?"   He replied, "Very.   He did not waver as to who the shooter

REPORT AND RECOMMENDATION
PAGE -12

01 was."   Detective Allen later stated, "We knew Mr. Blake had been identified by
Mr. Bess already."   When asked about Williams's identification to police, the
02 prosecutor asked, "When you showed Ivor Williams the photo array . . . what
was Ivor Williams's reaction?   What did he say?"   The detective replied,
03 "Immediately, he selected J.G.   [Footnote 4:   Blake was also known as "JG."]
I don't recall exactly what he said, but he pointed to the picture and indicated
04 that's JG, something to that very specific effect."

05 Later in the trial, Williams testified as to his recollection of the shooting.
He was asked, "Based on the relative position of where you were, where Cooper
06 was, where [Blake] was, who did the muzzle flash come from?"   He replied, "I
would say it came from [Blake] because he was on my right."   He later
07 explained:

08 I didn't see the person that pulled the trigger.   I saw the flash,
you understand.   It came from my right side.   [Blake] was on
09 my right side.   I didn't see the gun.   I just saw the flash, and I
heard it.   Instantly, when I saw the flash and heard the sound,
10 like I told you, I took off and ran.   I was already trying to make
my way out of the situation anyway.

11 Bess's testimony was similarly based on his perceptions of the
12 circumstances surrounding the shooting; defense counsel asked him:

13 Q:   Mr. Bess, I will attempt not to belabor it too much longer.
To the best of your recollection, considering now all the
14 information that you know, your observations on the night of the
shooting and whatever information you learned from Detective
15 Allen, you're saying – your testimony today that State's Exhibit
99 is your best recollection of where everybody was standing just
16 prior to the shooting?

17 A:   Yes ma'am.   Yes, ma'am.   But I didn't see honestly – I just
heard the bang, and logically it was only one person that could
18 have made that bang as close as they were with me.   YG
[Footnote 5:   Brown was known as YG.] did not have a gun, and
19 he was standing four or five feet behind me.   I know he looked
suspicious.

20 Q:   By "he," you mean JG?

21 A:   Yes.

22

REPORT AND RECOMMENDATION
PAGE -13

01          Q:  JG looked suspicious?

02          A:  Yes.

03          Q:  So it was based on those two things, right?

04          A:  Yes.

05          Q:  That JG looked suspicious and that is where they were
            standing, and that is why you think JG is the shooter?
06
            A:  How close he was to my head, how loud I heard the pop.
07
            Q:  You didn't actually see who the shooter was?  That's just
08          how you got to that conclusion, right?

09          A:  Yes.

10          Finally, when Hawthorne took the stand, she was asked what Bess told
        her when he initially got into her car after the shooting.   She replied, "He said
11      [Blake] shot that boy."

12          Blake assigns error to the following testimony:   (1)   Bess's
        identification of Blake as the shooter to the police, which was brought into trial
13      through Allen's testimony; (2)   Bess's identification of Blake as the shooter
        while testifying at trial; (3) Bess's statement to Hawthorne identifying Blake as
14      the shooter, which was brought into trial through Hawthorne's testimony; (4)
        Bess's exclamations in the voice mail recording, which was played for the jury;
15      (5) Williams's identification of Blake as the shooter to the police, which was
        brought into trial through Detective Allen's testimony; and (6) Williams's
16      identification of Blake as the shooter while testifying at trial.

17          All of the challenged testimony was based upon direct and specific
        observations by Bess and Williams, who were in the immediate vicinity of the
18      shooting.   The testimony was fact based:   it discussed the shooting, the
        positions of the people at the scene, and Bess's and Williams's other
19      observations.   The descriptions of the events surrounding the shooting had a
        tendency to help the jury better understand what happened, thus facilitating the
20      jury's fact-finding function.   Bess's and Williams's testimony did not contain
        conclusory legal terms, such as "guilt" or "intent."   Because the witnesses'
21      testimony stemmed from their own sensory perceptions, the jury was free to
        disbelieve either or both witnesses and reach a finding of not guilty.
22      Consequently, the testimony in question did not constitute opinions at all; rather,

REPORT AND RECOMMENDATION
PAGE -14

01   the testimony was to "inferences from the evidence."   Heatley, 70 Wn. App. at
     578.

03        Nevertheless, Blake asserts that Bess's and Williams's testimony was
     based on their opinions.   This is so, Blake contends, because "opinion
04   evidence" means "'[e]vidence of what a witness . . . infers in regard to facts in
     dispute, as distinguished from his personal knowledge of the facts themselves.'"
     Br. of Appellant at 24 (quoting BLACK'S LAW DICTIONARY 1093 (6th ed.
05   1990)).   By resorting to this dictionary definition, Blake seems to conflate the
     meanings of "opinion" and "inference" and thereby eliminate the effect of the
06   Supreme Court's choice to include both terms in ER 701 and ER 704.

07        We recognize that ER 701 and ER 704 do not explicitly distinguish
     between "opinions" and "inferences."   Nevertheless, it is clear that the
08   Supreme Court did not consider the words to be synonyms.   Indeed, there
     would have been no reason for the Supreme Court to have included each word in
09   each rule if the only result was to be redundancy.

10        Significantly, case law does not support the contention that the
     challenged testimony included impermissible opinions on guilt, as opposed to
11   allowable testimony as to inferences or fact-based observations.   See, e.g., State
     v. Mason, 160 Wn.2d 910, 932, 162 P.3d 396 (2007) (death certificate from
12   medical examiner admissible because based on specific observations and
     evidence referenced death rather than guilt); Heatley, 70 Wn. App. at 581
13   (testimony admissible because it was based on direct observation, was helpful to
     jury, and was not framed in conclusory terms that parroted a legal standard);
14   State v. Sanders, 66 Wn. App. 380, 388-89, 832 P.2d 1326 (1992) (testimony
     admissible because it did not prevent jury from rejecting the testimony and
15   finding defendant not guilty).

16        While we believe the challenged testimony to consist of inferences,
     rather than opinions, our decision is not solely based on this determination.
17   Even were we to consider the challenged testimony to include opinion evidence,
     our decision would be the same.   Our Supreme Court has set forth a method of
18   determining the admissibility of challenged opinion testimony.   Upon proper
     objection,

20        the trial court must determine its admissibility.    In determining
          whether such statements are impermissible opinion testimony,
          the court will consider the circumstances of the case, including
21        the following factors:  "(1) the type of witness involved, (2) the
          specific nature of the testimony, (3) the nature of the charges, (4)
22        the type of defense, and (5) the other evidence before the trier of

REPORT AND RECOMMENDATION
PAGE -15

01    fact."

02          However, this court has held that there are some areas
      that are clearly inappropriate for opinion testimony in criminal
03    trials.   Among these are opinions, particularly expressions of
      personal belief, as to the guilt of the defendant, the intent of the
04    accused, or the veracity of witnesses.

05    State v. Montgomery, 163 Wn.2d 577, 591, 183 P.3d 267 (2008) (internal
      quotation marks omitted) (quoting Demery, 144 Wn.2d at 759).

06

07          The challenged testimony did not concern an opinion on Blake's intent.
      The challenged testimony did not concern the veracity of any witness.   And the
08    challenged testimony was not a statement of the witnesses' belief as to Blake's
      guilt.   Thus, the challenged testimony was not of a type categorically excluded
      by Montgomery or Demery.

09

10          In State v. King, 167 Wn.2d 234, 219 P.3d 642 (2009), a witness's
      improper opinion on guilt was illustrated.   In that case, a police officer testified
11    that he had been trained on the elements of reckless driving and that King's
      observed conduct was within those elements.   167 Wn.2d at 330.   The
12    Supreme Court held this testimony to be an improper opinion on King's guilt.
      167 Wn.2d at 331.   Here, the challenged testimony was solely as to perceived
13    facts and inferences therefrom.   This was proper testimony.   The testimony in
      no way "undermine[d the] jury's independent determination of the facts."   State
      v. Olmedo, 112 Wn. App. 525, 531, 49 P.3d 960 (2002).

14

15          "Evidence is not improper when the testimony is not a direct comment
      on the defendant's guilt, is helpful to the jury, and based on inferences from the
16    evidence."   Olmedo, 112 Wn. App. at 531.   In Olmedo, the defendants were
      charged with unlawful storage of anhydrous ammonia.   This substance must be
17    stored in containers approved by the United States Department of
      Transportation or otherwise meeting "federal industrial health and safety
18    standards for holding anhydrous ammonia."   112 Wn. App. at 529.   The trial
      court denied Olmedo's request to instruct the jury as to the definition of "a DOT
19    'approved' tank or identify the applicable state and federal standards."   112
      Wn. App. at 530.

20          The court did, however, allow a witness to testify such that "'[t]he gist of
      his testimony indicated the propane tanks did not meet legal requirements *as he*
21    *understood them*.'"   112 Wn. App. at 529 (emphasis added).   The appellate
      court held that this testimony consisted of "improper opinions on the appellants'
22    guilt." 112 Wn. App. at 532.   This was because the court viewed the "testimony

REPORT AND RECOMMENDATION
PAGE -16

01    as giving improper legal conclusions." 112 Wn. App. at 532. "Improper legal
conclusions include testimony that a particular law applies to the case, or
02    testimony that the defendant's conduct violated a particular law." 112 Wn.
App. at 532. [Footnote 6: The court observed that whether "the tank was
03    approved was a core element of the charges" against the defendants. 112 Wn.
App. at 532. Blake argues that this means that no testimony based on
04    inferences can ever be admitted when that testimony is relevant to a "core
element." The Olmedo court did not so hold.] Neither Bess's testimony nor
05    Williams's testimony included any statements that constituted legal
conclusions.

06

07    Opinion testimony concerning ultimate issues of fact is not always
impermissible. Indeed "opinion testimony may not be excluded under ER 704
08    on the basis that it encompasses ultimate issues of fact." Heatley, 70 Wn. App.
at 578-79 (emphasis added). Bess's and Williams's testimony did not
09    constitute "expressions of personal belief," Montgomery, 163 Wn.2d at 591,
merely because some of the testimony may have "encompassed ultimate issues
of fact." Heatley, 70 Wn. App. at 578-79.

10

11    Analysis of the five factors set forth in Montgomery and Demery further
supports admission of the evidence. Bess and Williams were lay witnesses,
12    whose testimony did not carry any "special aura of reliability." Cf. King, 167
Wn.2d at 331 (police officer's testimony may carry special aura of reliability);
13    State v. Kirkman, 159 Wn. 2d 918, 928, 155 P.3d 125 (2007) (same). The
nature of the challenged testimony was that of otherwise allowable inferences
14    drawn from facts directly perceived by the witnesses' senses. The charge was
murder, arising from an assaultive act that resulted in fatal consequences, an
15    event capable of being perceived by those at the scene. The defense in question
was a general denial. The other evidence of guilt presented at trial was
16    abundant, including Blake's veritable confession in which he stated, "my bad,
my bad," when accused by Bess of shooting him as he fired at Brown. An
17    application of the factors set forth in Montgomery and Demery in no way
indicates that the trial court erred in its rulings.

18    There was no trial court error in the admission of the challenged
testimony.

19

20  (Id. at 6-13.)

21    Petitioner does not demonstrate that the admission of the witness testimony at issue

22  rendered the proceedings fundamentally unfair, or that the state court decision was contrary to

REPORT AND RECOMMENDATION
PAGE -17

01 or an unreasonable application of clearly established federal law.   As such, petitioner's first

02 and only exhausted ground for relief should be denied.[1]

03 C.        Certificate of Appealability

04          A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

05 dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA)

06 from a district or circuit judge.   A COA may issue only where a petitioner has made "a

07 substantial showing of the denial of a constitutional right."   *See* 28 U.S.C. § 2253(c)(2).   A

08 petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the

09 district court's resolution of his constitutional claims or that jurists could conclude the issues

10 presented are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*,

11 537 U.S. 322, 327 (2003).   Under this standard, the Court concludes that petitioner is not

12 entitled to a COA with respect to his claims.

13                                          CONCLUSION

14          The Court recommends the habeas petition be DENIED, and this case DISMISSED.

15 An evidentiary hearing is not required as the record conclusively shows that petitioner is not

16 entitled to relief.   A proposed Order accompanies this Report and Recommendation.

17

18

19          1 Although unexhausted, the Court also herein addresses respondent's alternative argument
   that petitioner's second ground for relief, even if not procedurally barred, is not cognizable in this
20 habeas proceeding.   *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be
   denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the
21 courts of the State.")   As noted by respondent, petitioner's second ground relief raises only issues of
   state evidentiary law, specifically, the state rule of evidence regarding hearsay.   (*See* Dkt. 1-2 at 10,
22 20-21.)   Accordingly, even if properly exhausted, petitioner would not be entitled to habeas relief in
   relation to this claim.   *See Estelle*, 502 U.S. at 67-72.

REPORT AND RECOMMENDATION
PAGE -18

01     DATED this <u>29th</u> day of August, 2014.

02

03                                                 _____
                                                   Mary Alice Theiler
04                                                 Chief United States Magistrate Judge

05

06

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -19